STATE of Missouri, Respondent,

v.

Mark Anthony GILL, Appellant.

No. SC 85955.

Supreme Court of Missouri,
En Banc.

July 12, 2005.

Rehearing Denied Aug. 2, 2005.

Deborah B. Wafer, Office of the Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Erwin O. Switzer, III, Assistant Atty. Gen., Jefferson City, for Respondent.

STEPHEN N. LIMBAUGH, JR., Judge.

A New Madrid County jury convicted Mark A. Gill of first-degree murder, armed criminal action, kidnapping, first-degree robbery, and first-degree tampering. Gill was sentenced to death on the murder count, life imprisonment on the robbery count, and consecutive sentences of thirty years imprisonment on the armed criminal action count, fifteen years on the kidnapping count, and seven years on the tampering count. Because the death penalty was imposed, this Court has exclusive jurisdiction of the appeal. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I. Facts

The facts, which this Court reviews in the light most favorable to the verdict, *State v. Christeson,* 50 S.W.3d 251, 257 (Mo. banc 2001), are as follows:

The victim, Ralph Lee Lape, Jr., lived alone in rural Cape Girardeau County. During the summer of 2002, Mr. Lape allowed Gill to live in a camper trailer on his property as a favor to a mutual friend. Mr. Lape spent the Fourth of July holiday weekend at Kentucky Lake, while Gill and a friend, Justin Brown, remained at Mr. Lape's home. During this time, Brown looked through Mr. Lape's personal papers and learned that he had a large amount of money in his bank account. Brown and Gill decided that they would kill Mr. Lape for his money, and on Saturday, July 6, they began preparations for the killing. They obtained a .22 pistol from Mr. Lape's home and bought a roll of duct tape, and they decided to "get him" in the garage because "once you pull in the garage can't nobody see."

Mr. Lape arrived home from Kentucky Lake on Sunday, July 7, at approximately 5:30 p.m. Gill and Brown, who were waiting in the garage, opened the garage door for him. After Mr. Lape stepped out of his extended cab pickup truck, Gill and Brown "grabbed him," and Gill told Mr. Lape that they "just wanted his money." Mr. Lape pleaded to Gill, "You don't have to do this ... I'll give you what you want. Mark, I ain't done nothing but try to help you." Gill and Brown then bound Mr. Lape with plastic ties and the duct tape.

They pushed up the backseat of Mr. Lape's truck and "slid him in." They divided $240 they found in a ziplock bag that Mr. Lape had been carrying. Gill then put shovels in the back of the truck because he "knew what [he] was fixin' to do, [he] was going to hell."

Gill drove the truck south on Interstate 55 as Brown held Mr. Lape down on the floorboard. After finding Mr. Lape's ATM bankcard in the truck, Gill asked him for the pin number, and he told them the number "right off." Gill and Brown drove Mr. Lape approximately 80 miles to a desolate cornfield near Portageville, where they took turns "knocking down corn" and "digging a hole." While one of them dug the hole, the other sat in the truck and watched Mr. Lape. After digging the hole, they took Mr. Lape out of the truck and removed the duct tape and plastic ties. Ignoring Mr. Lape's pleas for mercy, Gill and Brown pushed him into the hole. Then one of them pointed the .22 pistol at Mr. Lape and pulled the trigger, but the gun misfired. The trigger was pulled a second time, but there was another misfire. On the third try, the gun fired and shot Mr. Lape in the forehead, killing him. Gill and Brown then "lined him up in the hole" and removed all of his clothing and jewelry. Before they buried Mr. Lape, Brown "stepped on his head" in order to make it fit in the hole. An autopsy revealed that, in addition to the gunshot wound, Mr. Lape had a skull fracture that was "not caused by the bullet," three separate bruises on his head, bruising in his chest, and one of his ribs was completely broken in two.

After killing Mr. Lape, Gill and Brown changed clothes back at the house and withdrew money from Mr. Lape's bank account with his ATM card. They then drove to St. Louis, withdrew more money, and spent nearly a thousand dollars of the money at strip clubs. After spending the night at the Adam's Mark hotel in St. Louis, Gill and Brown drove back to Mr. Lape's house, stopping along the way to withdraw more money from Mr. Lape's bank account.

Once at the house, Gill and Brown began to dispose of the evidence. They dumped the shovels in a wooded area and burned their clothing and the clothing they had removed from Mr. Lape's body. They threw the gun, Mr. Lape's jewelry, and other evidence that would not burn into the Mississippi River. Then they drove to Paducah, Kentucky, abandoned Mr. Lape's truck in a hospital parking lot, and returned to Mr. Lape's house. When Mr. Lape's family members inquired about his whereabouts, Gill and Brown told them that he was at Kentucky Lake.

Having withdrawn nearly all of the money from Mr. Lape's bank account that was accessible with an ATM card, Gill and Brown used Mr. Lape's computer to transfer $55,000 from another account to the ATM-accessible account. After a friend told Gill that there is no limit in Las Vegas on the amount of money that can be withdrawn from an ATM, Gill and his girlfriend drove there and were married. Gill withdrew approximately $1,600 from Mr. Lape's account while on the trip.

Ultimately, Gill was arrested in New Mexico. He initially denied any involvement in Mr. Lape's disappearance and claimed he had permission to use the ATM card. However, he later confessed to planning and participating in the murder, but claimed it was Brown who shot Mr. Lape.

## II. Murder Verdict Directors

■ Gill's primary argument is that the trial court erred in submitting Instructions 8 and 11, the verdict directors for first and second-degree murder, because they at-

tributed the conduct elements of shooting Mr. Lape in the disjunctive to either Gill or Brown. He alleges that the jury should have been instructed that it had to find beyond a reasonable doubt that Brown was the shooter, with no reference to the possibility that Gill was the shooter because, according to Gill, there was no evidence that Gill was the shooter. This Court disagrees.

Instruction 8, the verdict director for first-degree murder, provided in pertinent part:

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First that on or about July 7, 2002, *the defendant or* Justin M. Brown caused the death of Ralph L. Lape, Jr., by shooting him, and

Second that defendant was aware that *his or* Justin M. Brown's conduct was practically certain to cause the death of Ralph L. Lape, Jr., and

Third, that beginning in Cape Girardeau County, Missouri, and ending in New Madrid County, Missouri, *the defendant or* Justin M. Brown caused the death of Ralph L. Lape, Jr. after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Ralph L. Lape, Jr., *the defendant acted together with or* aided Justin M. Brown in causing the death of Ralph L. Lape, Jr., and did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you will find the defendant guilty under Count I of murder in the first degree. . . .

(emphasis added). The pertinent portions of this instruction are identical to Instruction 11, the verdict director for second-degree murder.

■ "Whenever there is an MAI–CR instruction applicable under the law and Notes on Use, the MAI–CR instruction is to be given to the exclusion of any other instruction." *State v. Ervin,* 835 S.W.2d 905, 922–23 (Mo. banc 1992). This instruction was based upon MAI–CR3d 304.04, Note on Use 5(c), which is to be used "[w]here the evidence is not clear or conflicts as to which person (in a group including the defendant) engaged in the conduct constituting the offense." In such situations, Note 5(c) instructs the court to ascribe the conduct elements "to the defendant *or* the other person."

Gill contends that the court should have used instead the language from Note 5(a), which provides that "[w]here the evidence shows the conduct elements of the offense were committed entirely by someone other than the defendant and the sole basis for defendant's liability is his aiding the other person . . . all of the elements of the offense . . . should be ascribed to the other person or persons and not to the defendant." Gill claims that "the only evidence of who shot Ralph Lape" came from his confessions, which "unequivocally stated that Justin Brown shot Ralph Lape." Be-

cause there was no evidence that he was the shooter, Gill argues, the verdict director should have named Brown as the shooter, rather than stating that "the defendant or Justin M. Brown" shot Mr. Lape.

This Court rejected a similar argument in *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989), and affirmed the use of a disjunctive instruction because the evidence was unclear as to whether it was the defendant or her accomplice who killed the victims. In that case, the defendant and her accomplice were the last people in the victims' house while they were alive. The defendant admitted that she held a gun on the victims, got rope to bind them, and carried out the empty cans of roofing cement that was poured over the victims and set ablaze. The defendant also admitted to fleeing Missouri immediately after these events. In addition, the defendant named a different person responsible for the killings in each of her two confessions.

Similarly, in *State v. Gilbert*, 103 S.W.3d 743, 747–49 (Mo. banc 2003), this Court held that a verdict director nearly identical to the instruction given here was properly submitted because the evidence was unclear as to who shot the victims. The Court's reasoning was based on the fact that the defendant had given inconsistent statements about his involvement in the murder. He testified that he tied one of the victims' hands behind her back and led her down the stairs to the basement, but was upstairs when his accomplice shot the victims. At the time of his arrest, however, he claimed that he was in the victims' basement with his accomplice when the shots were fired.

Likewise, the verdict directors in this case were properly submitted because the evidence was not clear as to whether it was Gill or Brown who shot Mr. Lape. As in *Dulany* and *Gilbert*, Gill admitted to deep involvement in the crime. He admitted to planning the murder, abducting Mr. Lape, tying him up, driving him to a secluded location, digging his grave, and being present when he was shot and killed. And, as in *Dulany*, Gill fled Missouri after the crime. In addition to these admissions, Gill was wholly self-serving in stating that Brown pulled the trigger. Obviously, Gill had incentive to try to decrease his level of culpability in the hope that he would be treated less harshly if it were determined that he was not the shooter. Under these circumstances, the identity of the actual shooter—whether Gill or Brown—was unclear.

This conclusion is bolstered by Gill's several inconsistent statements. For instance, Gill initially denied any role in Mr. Lape's disappearance and claimed that he had permission to use Mr. Lape's ATM card. It was only later that he admitted to taking part in Mr. Lape's abduction and murder. Although Gill claimed that it was Brown who pulled the trigger, he also stated that when they accosted Mr. Lape in the garage, "I knew what I was fixin' to do, I was going to hell."

Gill's statements were also inconsistent with the physical evidence. As noted, the autopsy revealed that Mr. Lape had a skull fracture that was "not caused by the bullet," three bruises on his head, bruising to his chest, and one of his ribs was completely broken in two. Gill denied that he beat Mr. Lape and the only explanations he could provide for these injuries were that he restrained Mr. Lape in a "bear hug type hold" in the garage and that Brown stepped on Mr. Lape's head to make it fit in the grave. The medical examiner, however, concluded that Mr. Lape was beaten before his death. He testified that the bruises on Mr. Lape's head were caused by "a minimum of three" blows to the head, and that it would have taken a "solid

punch or kick or something similar" to have broken his rib completely in two. The medical examiner also concluded that "one stomp" would not have bruised three separate areas of the head, bruised the chest, and broken the rib.

Gill's self-serving account of the murder and the many inconsistencies in his story brought his credibility into issue, and as a result, the jury was not bound by Gill's statement that Brown was the shooter. *Dulany,* 781 S.W.2d at 55. Because the evidence was unclear as to whether it was Gill or Brown who actually shot Mr. Lape, the trial court did not err by submitting the conduct elements in the disjunctive.

█ Furthermore, Gill could not have been prejudiced by the disjunctive submission. As this Court held in *Dulany:*

> Even if there had not been enough evidence for the jury to find defendant committed the acts, the disjunctive submission would not have been reversible error. When the aider is found to have purposely aided in capital murder and thus has the same intent of the active participant, all other things being equal, they are liable to the same degree as the active participant. Defendant's admitted affirmative actions advanced the criminal enterprise and rendered her just as guilty as if she alone committed the acts.

*Id.* at 56 (internal citations omitted); *see also Gilbert* at 748.

### III. Armed Criminal Action Verdict Directors

In a related point, Gill alleges the trial court erred in submitting Instructions 15, 17 and 19, the verdict directors for armed criminal action, because they did not follow the Notes on Use with regard to accomplice liability.

Instruction 15 provided, in pertinent part:

> As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that defendant committed the offense of murder in the first degree, as submitted in Instruction No. 8, and
>
> Second, that defendant committed that offense with the aid of a deadly weapon, then you will find the defendant guilty under Count III of armed criminal action. . . .

Instructions 17 and 19 submitted the offense of armed criminal action as to the lesser included offenses of second-degree murder and second-degree felony murder but were otherwise identical to Instruction 15.

These instructions were erroneous, Gill explains, because "the evidence showed [Gill] did not use a weapon." In support, he cites Note on Use 4 to MAI–CR3D 332.02, which requires "[w]here it is alleged that a person other than the defendant employed a deadly weapon or dangerous instrument, the verdict director for armed criminal action must be in the form of MAI–CR 3d 304.04 [aider and accomplice liability]."

To the contrary, as noted, the evidence was unclear as to who fired the gun, so the murder verdict directors properly posited that "defendant or Justin M. Brown" shot Mr. Lape. Note on Use 4 also provides that "[w]here the defendant's liability for the underlying felony is premised on accomplice liability and where it is alleged that the defendant himself employed a deadly weapon or dangerous instrument in the commission of the offense, it is not necessary to submit the verdict director on Armed Criminal Action (MAI–CR 3d 332.02) in the form of Aider Liability." Here, the verdict directors in the underlying felony (murder) did in fact allege that

Gill "himself employed a deadly weapon or dangerous instrument in the commission of the offense," and although that submission was couched in the disjunctive, it still was unnecessary to use the accomplice liability language of MAI–CR3D 304.04 in the ACA verdict director. The trial court did not err in submitting these instructions.

## IV. Voir Dire

■ Gill next contends that the trial court erred in overruling his objections to the prosecutor's voir dire on accomplice liability. The key portion of the voir dire is as follows:

> PROSECUTOR: The Judge will tell you that in Missouri a person is respons[ible] not only for his own conduct, but also for the conduct of another person in committing a crime. The typical example that is given in law school, that if two guys are robbing a bank and one waits out in the car as the guy driving a getaway vehicle and the other one goes in and does the robbery, then both of them are guilty of robbery.
>
> DEFENSE COUNSEL: Judge, I'm going to object. He's not stating the law correctly.
>
> THE COURT: Overruled.
>
> PROSECUTOR: And, again, that's just an example. The judge will give you the exact law as to this case in the instructions.

■ The nature and extent of questioning on voir dire is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *State v. Ramsey*, 864 S.W.2d 320, 335 (Mo. banc 1993). A trial court may permit parties to inquire as to whether potential jurors have preconceived notions on the law that will impede their ability to follow instructions on issues that will arise in the case. *Id.* at

335–36. Prosecutors are entitled to use hypotheticals to make an inquiry on accomplice liability. When a prosecutor does not misstate the "basic concept" of accomplice or accessory liability, even if the description is incomplete, there is no error. *State v. Clemons*, 946 S.W.2d 206, 224–25 (Mo. banc 1997).

Gill alleges that the "prosecutor's hypothetical misled and misinformed the jurors on the law by greatly oversimplifying the law of accomplice liability." The hypothetical was improper, Gill argues, because it "stated the law in absolutes." In Gill's view, the prosecutor should have ended the hypothetical with "then both of them *can be* guilty," rather than "then both of them *are* guilty." This argument has no merit. The prosecutor's hypothetical conformed to the "basic concept" of accomplice liability. *Id.* Further, the prosecutor emphasized that the hypothetical was "just an example" and that the judge would give the jury "the exact law as to this case in the instructions."

## V. Statutory Aggravating Circumstances

Gill asserts that the trial court erred in overruling his objection and submitting Instruction 7A to the jury, concerning statutory aggravating circumstances. The jury found that the following three statutory aggravating circumstances existed: 1) that Gill committed the murder for the purpose of "receiving money or any other thing of monetary value from Ralph L. Lape, Jr.," section 565.032.2(4), RSMo 2000;[1] 2) that Gill committed the murder while "engaged in the perpetration of kidnapping," sec. 565.032.2(11); and 3) that the murder "involved depravity of mind" and "was outrageously and wantonly vile, horrible, and inhuman," sec. 565.032.2(7).

**1.** All statutory references are to RSMo 2000 unless otherwise indicated.

Gill contends that the first aggravator—that the murder was committed for the purpose of receiving money—should only be applied in "murder for hire" situations. To interpret that statute otherwise, he explains, the "receiving money" aggravator would be unnecessarily duplicative of another of the statutory aggravators set out in section 565.032.2(11), which is that the murder was committed during the commission of a robbery. However, despite the separate statutory aggravator for robbery, this Court has consistently held that the "receiving money" circumstance also is applicable to a murder committed during the course of a robbery. *State v. Kenley,* 952 S.W.2d 250, 276 (Mo. banc 1997); *State v. McDonald,* 661 S.W.2d 497, 502–05 (Mo. banc 1983). There is no compelling reason to depart from these holdings.

■ Gill also argues the third aggravator—that the murder involved depravity of mind—was unsupported by the evidence. The instruction provided that the jury could make a determination of depravity of mind if it found "that the defendant killed Ralph L. Lape, Jr., after he was bound or otherwise rendered helpless by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life." In particular, Gill contends that there was insufficient evidence to support a finding that he "killed" Mr. Lape because "there was no evidence [that Gill] shot or even 'participated' in the shooting of Ralph Lape." However, his only objection to this paragraph at trial and in his motion for new trial was that this aggravating circumstance did not apply because "the victim was unbound before he was killed." Gill did not challenge this instruction below on the ground that "there was no evidence [that he] shot or even 'participated' in the shooting." Therefore, he has failed to preserve this issue for review.

■ Furthermore, this Court notes that Gill objects only to the first and third of the aggravators. He does not challenge the instruction that he committed the murder while "engaged in the perpetration of kidnapping." Even if the first and third aggravators were invalid, a defendant is "death eligible" where, as here, at least one valid statutory aggravator was found. *State v. Morrow,* 968 S.W.2d 100, 117 (Mo. banc 1998).

### VI. Balancing of Aggravating and Mitigating Evidence

Gill argues that the trial court erred in overruling his objections and submitting Instructions 3A, 8A, and 10A, which required the jury to determine whether there were facts or circumstances in mitigation of punishment that were sufficient to outweigh the facts or circumstances in aggravation, so to preclude imposition of the death penalty. These instructions were erroneous, Gill contends, because they did not require the jury to make this finding beyond a reasonable doubt. This Court recently rejected this argument in *State v. Glass,* 136 S.W.3d 496, 520–21 (Mo. banc 2004). Although section 565.030.4 expressly requires the jury to use the reasonable doubt standard for the determination of whether any statutory aggravators exist, the statute does not impose the same requirement on the determination of whether evidence in mitigation outweighs evidence in aggravation. *Id.*

### VII. Absence of Statutory Aggravators in Information

Gill next argues that the trial court erred in overruling his motion to quash the information and exceeded its jurisdiction in sentencing him to death because the information did not plead the statutory aggravators later submitted in the penalty phase. This, he contends, is required by

*Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Gill's argument is based on the premise that while section 565.020 ostensibly establishes a single offense of first-degree murder, the statutes delineate two separate crimes: "unaggravated first-degree murder," which does not require proof of a statutory aggravator and carries a maximum sentence of life without parole, and "aggravated first-degree murder," which requires the additional element of at least one statutory aggravator and carries a maximum sentence of death. Because the information did not plead any statutory aggravators, Gill claims he was charged only with "unaggravated first-degree murder," and, therefore, the court exceeded its jurisdiction in sentencing him to death. This Court has repeatedly rejected this argument. *E.g., State v. Cole,* 71 S.W.3d 163, 171 (Mo. banc 2002). Missouri's statutory scheme recognizes a single offense of murder with a maximum sentence of death, and the required presence of aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty. *Id.* Gill also argues that this rationale is contrary to *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), but *Blakely* is inapposite because in that case, as in *Apprendi* and *Ring,* the trial judge increased the defendant's sentence without the required finding of fact by the jury. Here, the jury made all factual findings leading to Gill's conviction and sentence.

## VIII. Peremptory Strike

In his next point, Gill alleges the trial court erred in overruling his motion to strike for cause a prospective juror who indicated in a juror questionnaire that he favored the death penalty because it saves money. After the trial court denied Gill's motion to strike for cause, Gill used one of his peremptory challenges to remove the prospective juror.

■ Missouri law is clear that a conviction cannot be challenged based on the trial court's failure to strike for cause a prospective juror if that prospective juror was removed by a peremptory challenge. Section 494.480.4 provides, in pertinent part:

> The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

■ Gill argues that this statute is unconstitutional because it denies "access to the Missouri courts of justice," which apparently is a way of saying that in enacting section 494.480.4, the legislature has usurped the powers of the judiciary. However, the right to a panel of qualified jurors from which to make peremptory challenges is founded on statute and is not constitutional in nature. *State v. Gray,* 887 S.W.2d 369, 383 (Mo. banc 1994). The only constitutional requirement is that the jury actually seated must be made up of qualified and impartial jurors. *State v. Nicklasson,* 967 S.W.2d 596, 612 (Mo. banc 1998). Absent a constitutional provision to the contrary, the legislature does not usurp judicial power by changing or revoking a right created by statute. *Suffian v. Usher,* 19 S.W.3d 130, 134 (Mo. banc 2000). Accordingly, the legislature did not impermissibly deny "access to the Missouri courts of justice" by enacting this section.

This Court also rejects Gill's assertion that section 494.480.4 violates the equal protection clause "because its restrictions

on challenging a trial court's denial of strikes for cause do not apply to civil litigants." Gill's assumption that civil and criminal litigants are treated differently is erroneous because civil litigants are also precluded from challenging a trial court's failure to remove a prospective juror for cause if that juror is removed by a peremptory strike and does not actually sit on the jury. *Rodgers v. Jackson County Orthopedics, Inc.*, 904 S.W.2d 385, 389–91 (Mo.App.1995).

▇ Gill also claims that there is no rational basis for treating alleged juror empanelling errors that are cured by a peremptory challenge different from other alleged jury empanelling errors. To the contrary, section 494.480.4 has the rational purpose of avoiding unnecessary retrials in cases where the jury that decided the case met all constitutional requirements.

Because the prospective juror did not sit on the jury and participate in the verdict, Gill is precluded from challenging the trial court's refusal to strike that prospective juror for cause.

### IX. Victim Impact Testimony

▇ Gill asserts that the testimony of Diane and Mitch Miller, the sister and brother-in-law of Mr. Lape, exceeded the guidelines for victim impact evidence established by the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Victim impact evidence is admissible under the United States and Missouri constitutions, and the prosecution is allowed to show that a victim is not a faceless stranger and that his or her death represents a unique loss to society and to the family. *State v. Deck*, 994 S.W.2d 527, 538 (Mo. banc 1999) (citing *Payne*, 501 U.S. at 825, 111 S.Ct. 2597). The trial court has broad discretion during the penalty phase of the trial to admit whatever evidence it deems

helpful to the jury in assessing punishment. *State v. Johns*, 34 S.W.3d 93, 112 (Mo. banc 2000). Victim impact evidence violates the constitution only if it "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. 2597.

During the penalty phase, the court allowed Mrs. Miller to stand near the jury to show small photographs of Mr. Lape and his family to the jurors, and Gill did not object to this procedure as the first twenty-seven photographs were shown. Mrs. Miller then showed the jury a photograph of their mother's home and talked about how she and Mr. Lape had cleaned out the house after their mother became ill. Gill objected that Mrs. Miller was positioned "a foot from the jury [and was] visibly crying." Gill also objected that the photo was not victim impact evidence and was "beyond anything that should be allowed." The court directed the prosecutor to have Mrs. Miller sit in the witness stand and overruled the objection that the testimony was not victim impact evidence.

Mrs. Miller later read a prepared statement that discussed the impact of the crime on her family. The statement included moral lessons she and her siblings had learned from their parents about the importance of "working hard" and "liv[ing] within your means." She also mentioned that their father had been a prisoner of war during World War II. Gill objected, and the court directed the prosecutor to tell Mrs. Miller to omit further references to her father. Mrs. Miller also discussed their parents' deaths and how Mr. Lape helped steady her hand when she signed a consent form to remove their father's life support.

Mr. Miller then testified about the impact of the murder on his life. He discussed the "valuable good life lessons" that

he and Mr. Lape had learned studying "the mythical west." Among these lessons, Mr. Miller related, were the moral principles that "You don't cheat at cards, you don't start any trouble, but you stand up to it when it comes. You never shoot a man in the back, and, two against one is never a good program." He also discussed how he grew up "terribly, terribly poor." At Gill's request, the court noted for the record that Mr. Miller was "visibly upset, and, [had] been choking back tears."

 Gill contends that the Millers' victim impact testimony involved "excessively emotional content and presentation." The trial court has broad discretion in determining the effect of emotional outbursts on the jury. *Deck*, 994 S.W.2d at 539. This Court has previously found no error in cases where victim impact testimony left witnesses and even jurors crying. *Id.* at 538–39; *State v. Middleton*, 995 S.W.2d 443, 464 (Mo. banc 1999). Indeed, a certain level of emotion is to be expected when relatives of a murder victim discuss the impact of the crime on their lives. Gill has failed to show that the level of emotion displayed by the witnesses here was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. 2597.

 Gill also argues that much of the Millers' testimony was prejudicial because "it dwelt on their own morally solid upbringings" and "invited the jury to feel sympathy for their painful times … and use that irrelevant evidence to sentence [Gill] to death." It is not necessary that every piece of victim impact evidence relate to the direct impact of the victim's death on the witness. *See State v. Johnson*, 22 S.W.3d 183, 190 (Mo. banc 2000).

Mrs. Miller's references to her parents' deaths were proper because they demonstrated how Mr. Lape helped her during those situations. Her reference to her father having been a prisoner of war and Mr. Miller's reference to his poverty as a child were brief and did not prejudice Gill because those hardships were not attributed to him. *See State v. Clay*, 975 S.W.2d 121, 132 (Mo. banc 1998). And the Millers' discussion of their family's moral values was permissible in that it explained the values held by Mr. Lape. *See Johnson*, 22 S.W.3d at 190.

 In a related argument, Gill claims that "through comparison with their own families and upbringing" the Millers' testimony implied that he "was bereft of values and moral scruples, he had violated the rules of justice which [Mr. Miller], especially, held true, and [Gill] deserved to die." This, according to Gill, was contrary to *Booth v. Maryland*, 482 U.S. 496, 502–03, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), where the United States Supreme Court prohibited evidence that sets forth "family members' opinions and characterizations of the crimes and the defendant."[2] This Court disagrees. The Millers' discussion of their family's history and values did not constitute an opinion or characterization of Gill. Although Mr. Miller's statement that "You never shoot a man in the back, and, two against one is never a good program," could be interpreted as an indirect reference to the crime, when taken in context, it is clear that it was merely an example of the lessons of "the mythical west" that he and Mr. Lape had learned together. This testimony was far less explicit than the statements in *Booth*. In that case, family

---

**2.** Although the United States Supreme Court overruled much of *Booth* in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Court did not address *Booth's* prohibition of evidence that sets forth "family members' opinions and characterizations of the crimes and the defendant."

members expressed doubt "that the people who did this could ever be rehabilitated," and opined that "animals" would not have committed the crime. *Booth*, 482 U.S. at 508, 107 S.Ct. 2529. Even if Mr. Miller's statement was impermissible, this Court concludes that it was not "so unduly prejudicial" as to render the trial "fundamentally unfair." *Payne*, 501 U.S. at 825, 111 S.Ct. 2597.

### X. Independent Review

Under section 565.035.3, this Court is required to determine whether:

(1) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) the evidence supports the jury's finding of a statutory aggravating circumstance;

(3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Having thoroughly reviewed the record, this Court concludes that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

■ Furthermore, this Court holds that the evidence amply supports the jury's finding on the aggravating circumstances that Mr. Lape's murder was committed for the purpose of receiving money, that it was committed while Gill was engaged in the perpetration of kidnapping, and that it involved depravity of mind because the killing exhibited a callous disregard for the sanctity of all human life. As noted, the record shows that Gill planned to kill Mr. Lape in order to get access to his bank account. He abducted and bound Mr. Lape, drove him to a desolate cornfield and helped dig his grave. By his own account, he ignored Mr. Lape's pleas and stood by and did nothing as the gun twice misfired before Mr. Lape was shot and killed. As Gill put it in his confession, he "sold [his] soul" for money.

■ Finally, this Court concludes that the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. Death sentences have often been upheld where the defendant committed the murder for the purpose of receiving money or things of monetary value. *See, e.g., State v. Worthington*, 8 S.W.3d 83, 94 (Mo. banc 1999); *Deck*, 994 S.W.2d at 545; *State v. Barnett*, 980 S.W.2d 297, 310 (Mo. banc 1998); *State v. Hall*, 955 S.W.2d 198, 211 (Mo. banc 1997); *Kenley*, 952 S.W.2d at 276. This Court has also upheld death sentences when the murder was committed during the perpetration of a kidnapping. *See, e.g., Glass*, 136 S.W.3d at 521; *State v. Link*, 25 S.W.3d 136, 150 (Mo. banc 2000); *State v. Bucklew*, 973 S.W.2d 83, 97 (Mo. banc 1998); *Nicklasson*, 967 S.W.2d at 621–22; *State v. Brooks*, 960 S.W.2d 479, 495 (Mo. banc 1997); *Hall*, 955 S.W.2d at 211. And this case is similar to others in which defendants who were sentenced to death showed callous disregard for the sanctity of all human life by murdering people who were helpless or rendered helpless. *See, e.g., State v. Rousan*, 961 S.W.2d 831, 854 (Mo. banc 1998); *State v. Johnston*, 957 S.W.2d 734, 756 (Mo. banc 1997); *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc 1996); *State v. Walls*, 744 S.W.2d 791, 800 (Mo. banc 1988); *State v. Mallett*, 732 S.W.2d 527, 542–43 (Mo. banc 1987). Taking into account the crime, the strength of the evidence, and the defendant, this Court concludes that the death sentence in this case is proportionate to the death sentences imposed in similar cases.

## XI. Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.