Laura Denvir Stith, Judge
Defendant Daniel Ajak was charged with three counts of domestic assault. He was also charged with resisting arrest at the time of his arrest on those charges under section 575.150.[1] The jury acquitted him of two of the domestic assault charges, and the State dismissed the third charge after the jury was unable to reach a verdict.
*45 The jury convicted Mr. Ajak of resisting arrest. He appeals, alleging the circuit court erred by (1) overruling his motion for judgment of acquittal of resisting arrest because the relevant conduct occurred after his arrest was effected and (2) submitting a jury instruction that allowed the jury to convict him of resisting arrest if he used "physical interference" rather than requiring he actually resist the arrest. This Court reverses. Mr. Ajak's arrest was already effected and he was in police custody by the time any resistance occurred. Any resistance could not have been for the purpose of resisting an arrest that already had been accomplished. Accordingly, the judgment is reversed.
I. PROCEDURAL AND FACTUAL BACKGROUND
On February 15, 2015, Mr. Ajak and his girlfriend, Shanna McMackin were at home in the house they shared.[2] Ms. McMackin's two adult children, Sean and Courtney Elder, also were in the house that night when Courtney and Mr. Ajak got into a fight after Mr. Ajak refused to allow Courtney's boyfriend to come over to drink. Various witnesses testified Courtney was the aggressor, yelling at Mr. Ajak, hitting him, and pulling on his dreadlocks as he kept trying to push her away. When Courtney's brother Sean thought the argument had gone too far, he intervened and took Mr. Ajak to the ground. Mr. Ajak got back up and picked up a knife in the kitchen (he said to protect himself) as Courtney continued to yell and scream at him. Although Mr. Ajak did not use the knife, Ms. McMackin believed the fight had escalated too far and called the police. Courtney left before the police arrived shortly thereafter, at about 8:45 or 9 p.m. Upon the police's arrival, Mr. Ajak placed the knife in the sink and went toward the front door.
Meanwhile, Ms. McMackin and Sean, who were on the front porch, told the arriving officers Mr. Ajak was inside. The officers went in the open front door and saw Mr. Ajak approaching them from the kitchen. They ordered him to put his hands up and stop moving because they previously had been advised the disturbance involved a knife. Mr. Ajak put his hands in front of him but at first continued moving toward the officers. Once he stopped moving forward, an officer immediately detained him and placed him in handcuffs. Mr. Ajak yelled he was the victim, angry he had been placed in handcuffs. The officer walked Mr. Ajak to the kitchen and put Mr. Ajak in a chair at the kitchen table, where Mr. Ajak continued to yell and scream.
At some point, two more officers arrived, so there was a total of six officers at the residence. One officer stood over Mr. Ajak as he sat in the kitchen chair, while the other five officers spent some time moving between the kitchen and other areas of the house and speaking with each of the other individuals present about the alleged domestic disturbance.
After speaking with the witnesses and while Mr. Ajak still was handcuffed in a chair in the kitchen, one of the officers advised him he was under arrest and would be transported to jail. One of the officers later testified Mr. Ajak "knew at that point that he was under arrest." Mr. Ajak continued screaming and yelling he was the victim and he was not going to jail *46 while one of the officers left the residence to go pull the patrol vehicle in front of the house. While that officer was walking to and retrieving the patrol vehicle, because the weather was cold an officer "[g]rabbed some shoes and a shirt and a jacket to cover [Mr. Ajak] up" and "tried to get him to put on the clothing for a couple minutes." He refused the clothes.
It was at this point Mr. Ajak, restrained in handcuffs, was escorted out of the residence by two officers, one on each arm, with a third officer following behind. As the four walked to the patrol vehicle that had been moved right outside the residence, Mr. Ajak "kind of was jerking back and forth trying to break [the officers'] grip." This caused one of the officer's name tags to fall from his uniform. Mr. Ajak continued yelling and screaming, and "in doing so spit on the side" of one officer's face just before he was placed inside the patrol vehicle. That officer testified, "As I was opening the patrol vehicle door to place him in the backseat, he began to fight back a little bit and jerk and pull back away from us." Mr. Ajak did not break free from the officers' hold, however, and was secured in the patrol vehicle and transported to the jail.
The State charged Mr. Ajak with three counts of domestic assault and one count of resisting arrest. The jury acquitted Mr. Ajak of two counts of domestic assault but was unable to reach a verdict on the third count of domestic assault; the State ultimately dismissed that charge. The jury found Mr. Ajak guilty only of the one count of resisting arrest, and Mr. Ajak was sentenced to 280 days in jail. Mr. Ajak appealed. This Court granted transfer after opinion by the court of appeals. Mo. Const. art. V, § 10.
II. STANDARD OF REVIEW
In reviewing the evidence supporting the resisting arrest conviction, this Court's "review of sufficiency of the evidence is limited to whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." State v. Hunt, 451 S.W.3d 251, 257 (Mo. banc 2014) . "To determine whether the evidence presented was sufficient to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but, rather, " 'accept[s] as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignore[s] all contrary evidence and inferences.' " State v. Zetina-Torres, 482 S.W.3d 801, 806 (Mo. banc 2016), quoting, State v. Holmes, 399 S.W.3d 809, 812 (Mo. banc 2013) (alterations in original). But the "Court will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences." State v. Lammers, 479 S.W.3d 624, 632 (Mo. banc 2016) (citation omitted).
III. MR. AJAK'S ARREST WAS EFFECTED BEFORE HIS RESISTANCE BEGAN
Mr. Ajak was charged and found guilty of misdemeanor resisting arrest under section 575.150, which provides:
1. A person commits the crime of resisting or interfering with arrest, detention, or stop if, knowing that a law enforcement officer is making an arrest , or attempting to lawfully detain or stop an individual or vehicle, ... for the purpose of preventing the officer from effecting the arrest , stop or detention, the person:
(1) Resists the arrest , stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer;
*47 (Emphasis added).[3] To prove resisting arrest, the statute requires proof of three elements: (1) knowledge that the law enforcement officer is making an arrest; (2) purpose on the part of the defendant to prevent the officer from effecting the arrest; and (3) resisting the arrest by threatening the use of violence or physical force or by fleeing from such officer. § 575.150.1.
The parties disagree as to whether Mr. Ajak's arrest was completed while he was in the kitchen with the officers. Mr. Ajak does not claim he submitted to the custody of the officers, but rather argues he was under actual physical restraint while in the kitchen, handcuffed, and surrounded by officers who told him he was under arrest and kept him there under their control. The State argues being confined in the kitchen was inadequate and Mr. Ajak had to be placed in the patrol vehicle to be under arrest.
The resolution to the parties' disagreement depends on the statutory meaning of the term "arrest." The State acknowledges section 544.180, RSMo 2000, defines arrest as "an actual restraint of the person of the defendant, or by his submission to the custody of the officer, under authority of a warrant or otherwise," but it and the dissent nonetheless argue this definition does not apply to the resisting arrest statute, section 575.150. They do not identify any specific alternative definition of "arrest" they believe is controlling but rather say that because the criminal code in effect in 2015, chapters 556 to 579 of Title 38,[4] did not specifically adopt or reference section 544.180, that section's definition of arrest simply should be held to provide "guidance" comparable to guidance provided by common law interpretations of the term arrest. The dissent simply ignores the statute's definition, and the definition of "arrest" in Missouri cases, and turns to non-Missouri cases that apparently are more to its liking than Missouri precedent.
This Court disagrees section 544.180 does not set out the definition of "arrest" applicable in determining whether Mr. Ajak "resisted arrest" under section 575.150. Section 544.180 and its predecessors have defined "arrest" in an identical manner since at least 1879. See, e.g., RSMo 1879 § 1826; RSMo 1939, § 3959. Nothing in the criminal code or in Missouri law suggests the adoption of the revised criminal code in 1979, without more and without any indication in the code the legislature thereby intended to change the definition of the term "arrest," could be said to have sub silencio changed the meaning of the term "arrest" under Missouri law.
In any event, the definition of arrest in section 544.180 and its predecessors is perfectly consistent with the meaning of "arrest" in Missouri case law. In fact, Missouri's courts repeatedly have relied on the definition of "arrest" in section 544.180 in resolving cases involving resisting arrest or escape from custody. For example, this Court relied on section 544.180 's definition of arrest in Smither v. Director of Revenue, 136 S.W.3d 797, 798-99 (Mo. banc 2004) , in determining the defendant was under arrest even though not physically restrained by the officer, stating "The term 'arrest' is defined as the 'actual restraint of the person of the defendant, or ... submission to the custody of the officer, under authority of a warrant or otherwise.' Sec. 544.180, RSMo 2000" (alteration in original). Smither held, where, the defendant *48 was injured and in the emergency room with the officer present, he was under arrest because the officer placed the defendant within his control to the extent the defendant's condition allowed by telling the defendant he was under arrest, reading him his rights, and staying with him while he tried to contact his lawyer. Id.
State v. Sampson, 408 S.W.2d 84, 86-87 (Mo. 1966) , citing the statute similarly held: "A person may be said to be under arrest from the moment the police officer takes control of his movements. [§] 544.180, RSMo 1959, V.A.M.S." Other cases have used similar language. See, e.g., State v. Stokes, 387 S.W.2d 518, 522 (Mo. 1965) ("We agree with the finding of the trial court that defendant was under arrest from the time the officer took control of his movements and directed him to 'stand up.' Section 544.180."); cf. State v. Nicholson, 839 S.W.2d 593, 596 (Mo. App. 1992) (citing section 544.180 in holding that a man was not yet under arrest when he fled the police because an "arrest is made by either the 'actual restraint of the person of the defendant, or by his submission to the custody of the officer....' § 544.180, RSMo 1986").
Of course, the legislature can choose to adopt a special definition of a term when enacting a statute, as it did in adopting a specific definition of "custody" in the criminal code that went into effect in 1979. § 556.061(6), RSMo 1978 . That definition remains today. § 556.061(17), RSMo 2017 . But the legislature did not adopt a special meaning for the word "arrest" in adopting the criminal code and nothing in the code suggests the legislature intended to change the century-long meaning of the term "arrest."
Indeed, if the meaning of the term "arrest" in chapter 544 does not govern use of the term in the succeeding chapters of the Missouri statutes setting out substantive crimes, then it is unclear for what purpose the legislature enacted that definition, for chapter 544 does not itself set out substantive crimes. Rather, it is devoted to providing general definitions and preliminary procedural rules concerning issuing warrants, bail, how arrests are to be conducted, where the arrestee is taken after an arrest, and preliminary hearing procedures governing the handling of the substantive crimes set out in the criminal code sections that follow it. See § 544.020, RSMo 2000 (issuance of warrant upon complaint); § 544.040, RSMo 2000 (bail, associate circuit judge may grant, when); § 544.190, RSMo 2000 (rights of officer in making arrests); § 544.216, RSMo 2000 (powers of arrest, arrest without warrant on suspicion persons violating any laws of state including infractions, misdemeanors and ordinances, exception-power of municipal officer in unincorporated area); § 544.260, RSMo 2000 (arrest of person, where tried); § 544.250, RSMo 2000 (preliminary hearing, when required-release, when, what conditions). The legislature does not adopt "guidance" but rather law. These definitions and procedures set out in chapter 544 would have little or no purpose unless they were to govern prosecution of the crimes set out in the criminal code that follows.
It is well-settled: "When the legislature enacts a statute referring to terms that have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action." Balloons Over the Rainbow, Inc. v. Dir. of Revenue, 427 S.W.3d 815, 825-26 (Mo. banc 2014) (citation and quotation omitted). It is the meaning of ''arrest'' as set out in section 544.180 and as interpreted in prior case law that governs here.
No one disputes Mr. Ajak was restrained in handcuffs in the kitchen of his *49 home, with at least one and at times four to six officers present, and was told he was under arrest. The only issue is whether, on these facts, the arrest was complete before he was moved from the kitchen to the patrol vehicle, because if so, then the State failed to show "for the purpose of preventing the officer from effecting the arrest , stop or detention, the person ... (1) Resists the arrest." § 575.150 (emphasis added).
Not surprisingly, the cases indicate that what is sufficient restraint is highly dependent on the particular facts and circumstances, but the key factor this Court has identified is whether the evidence showed "actual restraint of the person of the defendant," Smither, 136 S.W.3d at 798, or otherwise showed control of the defendant's movements by the officer, Sampson, 408 S.W.2d at 87 .
And while, as the State notes, such restraint often is most easily shown when the defendant has been placed in a police vehicle or brought to the police station,[5] these cases do not support the State's narrow reading that an arrest requires the defendant to be put in the patrol vehicle or at least within a specific physical boundary. They could not so require, for the statute requires only restraint by the officer or submission to the officer's control. This could occur in many circumstances other than in a patrol vehicle (indeed, arrests were effected long before patrol vehicles existed) and in circumstances where physical boundaries are not available or utilized.
In Smither, for instance, an arrest was completed when a severely injured defendant was told he was under arrest and placed in a room to receive treatment while the officer stood guard outside. 136 S.W.3d at 799 . And State v. Jackson, 645 S.W.2d 725, 727 (Mo. App. 1982) , held the defendant's arrest had been effectuated once the officer "placed defendant under arrest for carrying a concealed weapon, checked the X-ray room, and waited outside while a technician x-rayed defendant." When defendant then escaped the x-ray room, he was not found to have resisted arrest but rather to have escaped from custody, for the arrest already had been completed. Id.
Similarly, in Sampson, the defendant was under arrest once the officers grabbed his arm on the street to prevent him from reaching for a weapon and searched him. 408 S.W.2d at 86-87 . The Court did not mention whether a patrol vehicle was nearby, for that was not relevant to whether the officers could search him incident to the arrest. Id. at 87. In Stokes , the Court rejected a claim that defendant was not yet under arrest when he was searched after being found hiding in the weeds near where a burglary had occurred and told to stand up. 387 S.W.2d at 522 . The Court found "the defendant was under arrest from the time the officer took control of his movements and directed him to 'stand up.' " Id.
By contrast, if the defendant is not actually under the officer's restraint or control, the arrest has not been effectuated. For example, a defendant was guilty of resisting arrest when, after being awakened in his bed and informed he was under arrest, he had a verbal altercation and "resisted arrest by threatening violence and using physical force in stiffening his arms and requiring the officers to coerce him by force." State v. Feagan, 835 S.W.2d 448, 450 (Mo. App. 1992) ; accord, Ondo, 231 S.W.3d at 315-16 (defendant not yet under arrest when although handcuffed and *50 read his rights, the officer still was attempting to remove the defendant's personal items when the defendant began to move toward the door and had to be subdued with a Taser before he ceased resistance); Belton, 108 S.W.3d at 176 (the defendant was not yet arrested because the officer "obviously did not have Belton restrained" when, although handcuffed and told he was under arrest, the defendant was still sitting in his wife's car and she drove off).
In each of these cases, the critical element in determining whether the arrest had been effected is whether the officer had control over the defendant's movements. As the State notes, in many cases it is easy to find an arrest effected when the defendant has been placed in a patrol car, for in that situation the person clearly is subject to the officer's actual restraint. But what is necessary to constitute restraint depends on the specific circumstances of each case. And this Court and the court of appeals have recognized a person may be subject to actual restraint in many different types of situations. Each case requires a fact-specific inquiry to determine at what point the arrest is complete. Indeed, a defendant who is not under the officer's restraint or control has been held to be not yet arrested even if the defendant is in the police station or patrol vehicle. See, e.g., Nicholson, 839 S.W.2d at 597 (when the defendant jumped up and ran out of the police station upon being told that he was being arrested, he had not yet been arrested as the officer had not yet "physically restrained" him nor had the defendant's "ability to absent himself been impaired").
Here, Mr. Ajak was actually restrained in his kitchen, before his walk to the patrol vehicle. The record reveals Mr. Ajak was handcuffed immediately after the officers entered the house. He remained handcuffed as he sat in the kitchen with one or more officers standing over him while the officers were at the residence. After speaking with other witnesses present, and as Mr. Ajak remained in handcuffs sitting at the kitchen table, the officers surrounded Mr. Ajak within the enclosed space of the kitchen and told him he was under arrest. At that point, Mr. Ajak's movements were completely under the officers' control; he was handcuffed and not free to leave, the officers attempted to dress Mr. Ajak for the walk to the patrol vehicle, and they took his arms in their hands and escorted him in handcuffs, at which point he resisted. His resistance, however, came only after the arrest was previously effected while in the officers' control within the kitchen.
The dissent argues "arrest" is a continuing process that may still be being "effected" even after the arrestee is restrained and in the officer's control and custody. Not only is this (as the dissent acknowledges) inconsistent with section 544.180, it also is inconsistent with the definition of "custody" under Missouri's criminal code and with the interpretation and application of the term "arrest" in Missouri case law, as discussed in detail above. Indeed, the dissent relies entirely on three cases decided under the laws of Kentucky, Arizona, and New Hampshire.[6] This case, however, must be decided under Missouri law. As noted, section 544.180 says arrest occurs when there is "an actual restraint of the person of the defendant," which this Court has interpreted to mean: "A person may be said to be under arrest from the moment the police officer takes control of his movements" Sampson, 408 S.W.2d at 86-87 . Consistent with this definition, numerous Missouri cases specifically *51 hold "the arrest must be in progress when the 'resistance' occurs. Once the arrest has been fully effectuated a defendant should be considered to be in custody." Shanks, 809 S.W.2d at 418 ; accord, Belton, 108 S.W.3d at 175 ; Feagan, 835 S.W.2d at 449 ; Ondo, 231 S.W.3d at 316 .
In fact, section 556.061 defines custody as occurring only once the person has been arrested: "a person is in custody when the person has been arrested but has not been delivered to a place of confinement." § 556.061(7) (emphasis added). Similarly, section 575.200 provides custody occurs after arrest and evading police at that point is escape from custody rather than resisting arrest: "A person commits the crime of escape from custody or attempted escape from custody if, while being held in custody after arrest for any crime, he escapes or attempts to escape from custody." (Emphasis added).
As such, under Missouri law, Mr. Ajak could not have had the specific purpose of preventing an arrest while being walked to the police vehicle because his arrest had been previously effected when he was actually restrained by the officers and under their control in the kitchen. He was already under arrest and in custody when his alleged resistance occurred. Because arrest and custody are chronologically and legally separate events under the statutory and common law framework, if Mr. Ajak committed any crime, it would have been attempt to escape from custody, not resisting arrest. For reasons not revealed by the record, the State chose not to charge Mr. Ajak with an attempt to escape from custody. The evidence did not support the submission of resisting arrest, and the judgment finding Mr. Ajak guilty of that crime must be reversed.
IV. CONCLUSION
Because Mr. Ajak's arrest had already been effected, he could not have been guilty of resisting arrest. The judgment is reversed.
Draper, Russell and Breckenridge, JJ., concur;
Powell, J., dissents in separate opinion filed;
Fischer, C.J. and Wilson, J., concur in opinion of Powell, J.

All statutory references are to RSMo Supp. 2014, unless otherwise noted.

"This Court reviews the facts in the light most favorable to the verdict." Elliott v. State, 215 S.W.3d 88, 90 n. 4 (Mo. banc 2007), citing, State v. Gill, 167 S.W.3d 184, 187 (Mo. banc 2005). The jury acquitted Mr. Ajak of the two domestic abuse charges that were not dismissed but convicted him of resisting arrest.

The case involves only an arrest, not a stop or detention.

A new criminal code went into effect January 1, 2017. See chapters 556 to 579 of Title 38, RSMo 2017. It similarly does not contain a definition of arrest.

See, e.g., State v. Shanks, 809 S.W.2d 413, 418 (Mo. App. 1991), overruled on other grounds by Joy v. Morrison, 254 S.W.3d 885 (Mo. banc 2008) ; State v. Ondo, 231 S.W.3d 314, 316 (Mo. App. 2007) ; State v. Belton, 108 S.W.3d 171, 175-76 (Mo. App. 2003) .

In each of these cases, the resistance occurred within moments of when the person was placed in handcuffs, and the court noted that, in such cases, it can be hard to determine when the arrest was completed. That was not the fact situation here.