STATE of Missouri, Plaintiff–Respondent,

v.

James L. CARPENTER, Defendant–Appellant.

No. 23443.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 31, 2001.

Richard D. Bender, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

C. DAVID DARNOLD, Special Judge.

James L. Carpenter ("Defendant") was convicted by a jury of the crime of first degree burglary, Section 569.160, RSMo 1994, and armed criminal action, Section 571.015, RSMo 1994. Defendant was found not guilty of the crime of forcible sodomy. Defendant was sentenced to fifteen years on the burglary charge and forty-five years on the armed criminal action charge to be served consecutively.

In this appeal, Defendant contends the trial court erred in defining assault as it did in Instruction No. 5 on the first degree burglary charge. He also contends the trial court erred because it did not sustain the challenge for cause of one venireperson who had a relationship with the Joplin

Police Department and who knew all of the police officers, including the two officers who testified for the State.

■ Appellant does not challenge the sufficiency of the evidence supporting his conviction. This Court accepts as true all evidence supporting the verdict, including all favorable inferences therefrom and disregards all contrary evidence and inferences. *State v. Dunn*, 21 S.W.3d 77, 79 (Mo.App. S.D.2000), *State v. Carlile*, 9 S.W.3d 745, 746 (Mo.App. S.D.2000).

Judith Ann Seymour ("Seymour") lived with Defendant from about 1993 until 1996, at which time Seymour asked Defendant to leave as he had started seeing another woman. Seymour would see Defendant from time to time after he moved out, but the two no longer had a romantic relationship.

On July 21, 1998, Defendant went to Seymour's house wanting to know if she would take him to get his flat tire fixed. Seymour did not have time to do so, but she did drop Defendant off at his house and told him she would come by after work to see if he still needed help with the flat tire. When Seymour got off work at approximately 12:30 p.m., she drove by Defendant's house and, seeing that Defendant's truck was gone, assumed that he had gotten the tire fixed. Upon arriving at her home, Seymour called Defendant's home and left a message that she had been by his house to see if he needed help, but since his car was gone, she assumed that he had the tire fixed.

An hour later, Seymour was in her bathroom getting ready to go out when Defendant entered her house. When she told him she was in a hurry, he said he wasn't going to stay. Defendant seemed upset, nervous, and scared, saying that he did not know what to do, or how he was going to make it. Seymour's granddaughter arrived at that time, but Defendant didn't want to talk in front of her. When Defendant and Seymour went out to the porch to talk, Seymour's granddaughter followed them and told Defendant if he didn't leave she was going to call the police. Defendant left, but yelled at both Seymour and her granddaughter that he would get even with Seymour.

Later that evening when Seymour was home in bed, a noise awoke her, she got up and looked in the kitchen and saw a flash go through the kitchen. Defendant had broken in the back door of her house by breaking out the glass and kicking the door open and had shot out the front of her oven. The next thing Seymour knew, Defendant was on top of her with a gun at her throat. Defendant made Seymour take her pajama top off and told her "he was in control." Defendant grabbed the portable phone, threw it in the bathroom, and jerked another phone out of the wall in the dining room. It was determined later that the phone lines outside the house had also been pulled. Defendant then fired the gun over Seymour's shoulder hitting a mirror. Seymour ran to another room trying to get away, but Defendant caught her and pulled her pajamas bottoms off, grabbed her by the hair and pulled her into the kitchen. While in the kitchen he poured a beer that he had brought into the house on her, and took another beer from the refrigerator and also poured it on her. Defendant kept saying "I'm in control."

Seymour believed Defendant was going to kill her. She tried to get a hammer to defend herself but Defendant grabbed it and threw it away. Seymour stated she needed to use the bathroom, but Defendant would not allow her to go. Instead, Defendant made her go outside and urinate in the back yard. Seymour then tried to escape by running out the back door,

but was hit in the back of the neck with something. The next thing Seymour remembered, she was coming to and getting up when Defendant hit her in the jaw. This time she fell on the concrete floor in the utility room and again lost consciousness. At some point, Defendant also shot a family picture and fired several shots into the dining room.

Seymour next remembered Defendant on top of her with his penis out and trying to put it in her mouth. He also unsuccessfully tried to put his penis, as well as a spray paint can, in Seymour's vagina. He took the handle to a broom or plunger and put it in Seymour's vagina. Defendant then grabbed Seymour by the hair and dragged her over to the hot water tank. He told her he was going to take her to Arkansas where he thought her boyfriend lived and he would take care of both of them. He stated he had "already killed three men, and one more ain't going to make any difference." Seymour stated she did not believe he had killed three men, but was afraid he was going to kill her.

Defendant's knee collapsed when he got up, and Seymour asked if she could get a warm cloth for it. Seymour went into the bedroom, took the rifle Defendant brought into her house and shoved it under the bed. She went to another room, got a robe, went through the dining room and ran out the front door. Seymour stopped a van going down the street and asked for help. The van driver nodded and drove off. She then started knocking on doors, but got no answer. When she went to her next-door neighbor's, he let her in and called 911. When the police arrived, Seymour told them Defendant had broken into her house, broken numerous things, shot several appliances, and that she had been sexually assaulted. Seymour was taken to the hospital that night and received care in the emergency room. She declined a rape test however, stating that she had been through enough. Defendant told the police officers that Seymour had assaulted him, that she had cut him with a piece of glass, that they had consensual sexual relations, and that Seymour's boyfriend came in and beat him up.

Defendant testified at trial that he had gone by Seymour's house, that they had gotten into an argument, and that she had actually picked up the gun. When Defendant went inside to get the gun away from Seymour, the gun went off several times accidentally. Defendant denied sodomizing Seymour.

■ This appeal followed the jury's guilty verdict. Defendant's first point on appeal alleges that the trial court erred in giving Instruction No. 5 to the jury because that instruction failed to properly define the crime of assault, and that the definition permitted conviction based on a lesser mental state and level of conduct than required by the crime of assault. That instruction was:

INSTRUCTION No. 5

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 22, 1998, in the County of Jasper, State of Missouri, [Defendant] knowingly entered unlawfully in an inhabitable structure located at 1618 Sergeant, Joplin, Jasper County, Missouri and possessed by [Seymour], and

Second, that [Defendant] did so for the purpose of committing the crime of assault therein, and

Third, that while [Defendant] was in the inhabitable structure, [Seymour] was present in the structure and [Seymour] was not a participant in the

crime, then you will find [Defendant] guilty under Count I, of burglary in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [Defendant] not guilty of that offense.

*A person commits the crime of assault if he purposely or knowingly places or attempts to place another in fear of physical harm.*

If you do find [Defendant] guilty under Count I of burglary in the first degree, you will assess and declare the punishment at imprisonment for a term of years fixed by you, but of less than five years and not to exceed fifteen years. (Emphasis added.)

During the instruction conference, Defendant objected to Instruction No. 5 because of the definition given for assault. Defendant again raised this issue in his motion for new trial. The State concedes Defendant is correct when he asserts the definition of assault submitted in Instruction No. 5 was incorrect.

 "In every trial for a criminal offense the court shall instruct the jury in writing on all questions of law arising in the case that are necessary for their information in giving the verdict." Rule 28.02(a).[1] "The giving or failure to give an instruction or verdict form in violation of this Rule 28.02 or any applicable Notes on Use shall constitute error, the error's prejudicial effect to be judicially determined ..." Rule 28.02(f). A faulty instruction is grounds for reversal if the defendant has been prejudiced. *State v. Carson*, 941 S.W.2d 518, 523 (Mo. banc 1997); *State v. Betts*, 646 S.W.2d 94, 99 (Mo. banc 1983).

"If the giving of the instruction is error, it will be held harmless only when the court can declare its belief that it was harmless beyond a reasonable doubt." *State v. Erwin*, 848 S.W.2d 476, 483 (Mo. banc 1993).

Section 569.160, RSMo 1994, provides that one commits the crime of first degree burglary if he "knowingly enters unlawfully ... [in an] inhabitable structure for the purposes of committing a *crime* therein." (Emphasis added.) In this case, the State charged that Defendant "knowingly entered unlawfully in an inhabitable structure, ... for the purpose of committing assault therein." Thus it was charged that the crime of assault was the purpose for Defendant's entry into Seymour's home.

MAI–CR 3d 323.52 is the verdict directing instruction for first degree burglary. Instruction No. 5, as given in this case, correctly tracks the mandatory first degree burglary instruction. The applicable Notes on Use for this instruction gives the drafter guidance as follows:

2. Definitions.

(a) This instruction contains the direction "[*Insert a definition of the crime that defendant intended.*]." This direction refers to the crime named in paragraph Second.

A definition of the crime must be included in the instruction. It shall be inserted immediately before the last paragraph of the instruction. See Notes on Use 2D to MAI–CR 3d 333.00.

The definition of assault used in Instruction No. 5 comes from MAI–CR 3d 333.00, which expressly indicates that the definition is derived from Chapter 455 of the Revised Missouri Statutes. Section 455.010(1)(a), RSMo Cum.Supp.1997, is the definition section of Chapter 455 and sets

---

1. All references to rules are to Missouri Rules of Criminal Procedure (2001), unless otherwise indicated.

out the exact wording used by the State in drafting the definition of assault used in Instruction No. 5. Chapter 455, deals with proceedings under which family members can seek orders of protection, as opposed to assault under the criminal code of Missouri. At the time this case was tried, Section 455.085, RSMo Cum.Supp.1997, permitted a police officer to make an arrest on probable cause to believe an assault, as defined in Section 455.010, RSMo Cum.Supp.1997, had been committed against a family or household member. The adult abuse statutes, found in Chapter 455, did not establish a crime of assault, especially in this case, where the defendant was not a family or household member.[2]

Every definition set out in the MAI–CR 3d 333.00 series identifies the chapter or statute from which the definitions are derived. There is only one definition of assault given in the 333.00 series. As stated above, this definition of assault is not derived from Chapter 565, which is the criminal assault chapter.

When there is no definition of the crime to be defined in MAI–CR 3d 333.00, the applicable Notes on Use state that "... an appropriate definition of the crime shall be drafted and submitted to the Court for approval. For guidance, an examination of the appropriate statute is suggested, as well as any applicable verdict directing

instruction and its Notes on Use." MAI–CR 3d 333.00, Notes on Use 2D.

Both the State and Defendant agree that the definition of assault used in Instruction No. 5 comes closest to the elements and the language set out for assault in the third degree. A person commits the crime of assault in the third degree if he purposely places another person in apprehension of immediate physical injury. Section 565.070.1(3), RSMo1994.[3]

We do not dispute that the definition given comes closer to third degree assault under Section 565.070.1(3), RSMo 1994, than any other crime of assault. We agree, as argued by the State, that a jury could have found that Defendant committed several versions of third degree assault if properly instructed. Here the issue is whether the jury was misled to Defendant's detriment when it was instructed that assault occurs when a person purposely or knowingly places or attempts to place another in fear of physical harm, when the closest applicable criminal assault statute only requires a mental state of purposely, and does not include an attempt to place another in fear of physical harm.

Section 562.016.1, RSMo 1994, provides that "a person is not guilty of an offense unless he acts with a culpable mental state, that is, unless he acts purposely or knowingly or recklessly or with criminal negligence." "A person 'acts purposely,' or

---

**2.** After the trial of this case, the legislature expanded the definition of family or household member to include one who is or has been a continuing social relationship of a romantic or intimate nature with the victim. Section 455.010(5), RSMo 2000. The legislature also established new crimes of domestic assaults. Section 565.072, 565.073 and 565.074, RSMo 2000.

**3.** Section 565.070.1, RSMo 1994, provides as follows: "A person commits the crime of assault in the third degree if: (1) He attempts to cause or recklessly causes physical injury to

another person; or (2) With criminal negligence he causes physical injury to another person by means of a deadly weapon; or (3) He *purposely* places another person in apprehension of immediate physical injury; or (4) He recklessly engages in conduct which creates a grave risk of death or serious physical injury to another person; or (5) He knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative." (Emphasis added.)

with purpose, with respect to his conduct or to a result thereof when it is his conscious object to engage in that conduct or to cause that result." Section 562.016.2, RSMo 1994. "A person 'acts knowingly,' or with knowledge, (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." Section 562.016.2(3), RSMo 1994.

Instruction No. 5's definition of assault allowed the jury to find that Defendant had the purpose of committing an assault which was defined as occurring if he acted only "knowingly," but not "purposely." Thus, Instruction No. 5 was faulty insofar as it defined assault. Instruction No. 5 was defective also in that it included within its definition of assault, one who "attempted" to place another in fear or apprehension of harm or injury while the statute required that one be actually placed in fear or apprehension.

As submitted, this instruction allowed the jury to find Defendant committed assault purposely or knowingly. This instruction excuses the State from its burden of proving the higher mental element of purposely as opposed to the lower mental element of knowingly.

■ For the reasons stated, Instruction No. 5 was erroneous. We also find prejudice is shown by the fact that the jury was not required to find the requisite mental state in order to find Defendant intended to commit the crime of assault, and by the fact that the jury could find that Defendant had the purpose of committing an assault if he was only going to attempt to place Seymour in fear of physical harm. The conviction for armed criminal action must also be reversed because a conviction for armed criminal action cannot stand unless Defendant is first found guilty of the underlying felony of first degree burglary. Because the court's rulings on Defendant's first point is dispositive of this case, it is unnecessary for this court to rule on Defendant's second point.

We reverse and remand the case for a new trial.

GARRISON, J., and BARNEY, C.J., concur.