

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD83205** |
| | ) | |
| v. | ) | **OPINION FILED: March 9, 2021** |
| | ) | |
| **NATHAN R. HENDRICKS,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Marco Roldan, Judge

Before Division Four:  Cynthia L. Martin, Chief Judge, Presiding, Lisa White Hardwick, Judge and Mark D. Pfeiffer, Judge

Nathan R. Hendricks ("Hendricks") appeals from a judgment convicting him of felony murder in the second degree, burglary in the first degree, attempted robbery in the first degree, and two counts of armed criminal action.  Hendricks asserts that the trial court committed error in instructing the jury on the charge of attempted robbery in the first degree, in failing to dismiss the charge of attempted robbery in the first degree due to an insufficient information, and in denying his motion for judgment of acquittal on the charge of felony murder in the second degree.  Finding no error, we affirm.

## Factual and Procedural Background[1]

During 2017, Hendricks and Sheila Casey ("Casey") were in an "off-and-on" romantic relationship. At the same time, Casey was spending time with William Domann ("Domann").

Hendricks and Casey ended their relationship in October 2017. Hendricks took a truck that Casey wanted, and Casey took a Corvette from Hendricks. Domann helped Casey hide the Corvette. Despite the end of their relationship, Casey and Hendricks remained in communication.

On Sunday, October 29, 2017, at 2:16 p.m., Hendricks sent Casey a text message that read, "Well, I'm heading over to take care of it tonight. I love you. In touch with you. Or they going to pick you up tomorrow so good luck. I'm turning the phone off to see you." That same day, Casey spent time with Domann, including going to Ameristar Casino. Casey and Domann left the casino at approximately 11:25 p.m., and went back to Casey's house for a drink before Domann went home. At 2:12 a.m. on October 30, 2017, Domann sent Casey a text message that read, "goodnight."

Later that morning, Casey unsuccessfully tried to contact Domann. Casey and a friend went to Domann's home in Independence, Missouri. When they arrived, Casey noticed that the door was splintered and opened. Casey walked in the house and called Domann's name. He did not answer. Casey asked her friend to call the police.

---

[1]We view the evidence in the light most favorable to the jury's verdict, disregarding all contrary evidence and inferences. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020).

The police arrived at Domann's home at approximately 10:30 a.m. Officer Cameron Ault ("Officer Ault") testified that the door and its frame had sustained damage that indicated it had been forced open. After calling out their presence and hearing no response, officers entered a bedroom, where they found Domann deceased. Domann was in bed, partially covered with a blanket. Domann's hands were bound with zip ties above his head. Officer Ault observed that Domann had an apparent gunshot wound to his neck. An autopsy revealed that Domann suffered blunt-force injuries to his face and hands around the time of his death, and multiple gunshot wounds to his head, shoulder, forearm, and hand. Stippling observed on Domann's head indicated he had been shot from a close range.

Officers found a .9-millimeter handgun, with a live round in the chamber and seven rounds in the magazine, at the foot of the bed. Several empty .9-millimeter cartridge casings were found in the bedroom, along with a bullet lodged in insulation behind a bedroom wall and bullet fragments in the floor. Forensic analysis of the cartridge casings, bullets, and bullet fragments led to the conclusion that at least two guns were used in the shooting. Though one gun fired five of the recovered cartridge casings, it was not the handgun found at the scene. Similarly, the bullets and bullet fragments could have been fired from the same firearm, but were not fired from the handgun found on the scene. A sixth cartridge casing found at the scene could not be ruled out as having been fired from the handgun found at the scene.

Officers found a trail of blood droplets leading from the bedroom where Domann was found, to the hall, through the kitchen and living room, out the front door, and onto

3

the front porch. The blood droplets then led through a large wooded area behind the home. Officers followed a grass trail through the wooded area and found a roll of duct tape. The grass trail eventually led to a creek. On the other side of the creek was a strip mall parking lot, where officers found the liner of a jacket, a fleece glove, and zip ties that appeared to be of the type used to bind Domann's hands. A blood stain was also found on the concrete.

A tenant located in the strip mall had surveillance cameras. Detective Chad Cox ("Detective Cox") reviewed footage from the cameras. He observed a man limping in the parking lot behind Domann's home at around 5:34 a.m. on October 30, 2017, before getting in a white pickup truck. The video appeared to show a person on the passenger side sliding over to the middle of the seat to make room for the limping man.

Additional surveillance footage showed the same white pickup truck stopping at a nearby gas station at 4:57 a.m. the same morning. Hendricks exited the pickup truck, entered the store, and purchased items before leaving the gas station five minutes later. Surveillance footage from another local business showed the same white pickup truck traveling toward Domann's home around 5:11 a.m.

DNA analysis of the blood found on the kitchen floor, the front porch, and the concrete were matched to Xavier Otero ("Otero"). When Detective Cox arrested Otero, he was suffering from a gunshot wound to his right leg. Detective Cox interviewed Otero and learned about the involvement of Onelio Garcia ("Garcia") in Domann's shooting. Garcia was arrested on November 4, 2017.

4

Detective Cox received a tip that Hendricks had gone to his brother's home in Columbia, Missouri. Hendricks's brother confirmed that Hendricks and Casey had been to his house. Hendricks's brother gave Detective Cox the phone number that Hendricks had been using. Detective Cox tracked that phone number, leading to Hendricks's arrest in Gulfport, Mississippi. When he was arrested, Hendricks produced a driver's license that belonged to his brother. Casey was with Hendricks when he was arrested.[2]

The State charged Hendricks via information as a prior and persistent offender with felony murder in the second degree ("Count I"), armed criminal action ("Count II"), burglary in the first degree ("Count III"), attempted robbery in the first degree ("Count IV"), and armed criminal action ("Count V").[3] Garcia and Otero were also charged in connection with Domann's murder. Garcia was initially charged with murder in the first degree.[4] However, Garcia reached an agreement with the State to plead guilty to murder in the second degree, armed criminal action, burglary in the first degree, attempted robbery in the first degree, and armed criminal action, in exchange for testifying against Otero and Hendricks.

During Hendricks's trial in August 2019, Garcia testified that he had known Otero for approximately ten years, but first met Hendricks on October 29, 2017, after smoking methamphetamine earlier that day. Garcia testified that he bought and sold tools, and his

---

[2]Casey was later arrested for, and pleaded guilty to, hindering prosecution of a felony.
[3]The State initially charged Hendricks via indictment with felony murder in the second degree, armed criminal action, burglary in the first degree, robbery in the first degree, and armed criminal action. The State later filed a motion for leave to file an information in lieu of indictment and explained at a pretrial hearing that it was reducing Count IV, robbery in the first degree, to attempted robbery in the first degree because the State could not establish that "they took the money."
[4]The record does not indicate how Otero was charged.

5

mechanic gave Hendricks's phone number to Garcia so they could do business. Garcia called Hendricks. Then Garcia, his four-year-old son, and Otero went to Independence to meet Hendricks. Hendricks showed Garcia tools that he was looking to sell for about $5,000. Garcia found a buyer for the tools, and Hendricks drove Garcia, Garcia's son, and Otero in his white truck back to Kansas City, Kansas for the sale. The men dropped Garcia's son off, and then they went to Otero's home, where they met the potential buyers. The potential buyers were interested, and Garcia asked them, as instructed by Hendricks, if they would pay in cash or in methamphetamine. A deal was never reached.

Garcia testified that when he told Hendricks a deal was not reached, Hendricks "got really upset," and blamed Garcia. According to Garcia, Hendricks "started making threats," "pulled a gun out," and "started waving [the gun] around and [saying] he was going to kill [Garcia]." Hendricks said that Garcia owed Hendricks money and that "he was going to get his money regardless whether it was cash or blood." Hendricks then took Garcia for a drive in the white pickup truck, eventually stopping at 7th Street Casino in Kansas City, Kansas for a short time. Garcia testified that Hendricks then continued to drive Garcia around while making threats.

Eventually, Hendricks told Garcia that "he had a job that if [Garcia] did it, [Garcia] would be able to cancel what [Garcia] owed him." According to Garcia, Hendricks said that there was an older man who was "messing with" his wife and that the man had $50,000 to $100,000 cash and Xanax in his home. Garcia testified that Hendricks said that he had been stalking the man for approximately a month. Hendricks said that the man was harmless, but told Garcia that he believed the man and "his girl"

6

were "in cahoots," hiding a Corvette from Hendricks. Garcia agreed to do what Hendricks wanted.

The pair returned to Otero's home to plan how "to force the guy to give [them] the money that he had and the Xanax" "[b]y any means necessary." The plan was for Hendricks to drive Garcia and Otero in his pickup truck to Domann's home, and then Garcia and Otero would "go in with guns, tie [Domann] up, try and get his money and Xanax." Hendricks was supposed to drive up and down the road behind Domann's house, waiting for Otero and Garcia to call him when they were done. Otero took two guns out of his pocket during the drive to Independence. Otero gave one gun to Garcia. Before arriving at Domann's home, Hendricks stopped at a store, and then gave Otero and Garcia gloves, duct tape, and zip ties, and told them to use the items if necessary. Hendricks then stopped at a gas station to buy beverages.

Hendricks then drove to Domann's home, and dropped off Otero and Garcia. Otero and Garcia used their shoulders to force their way into Domann's home, and then went to Domann's bedroom. Otero began wrestling with Domann, while Garcia fumbled around for the light switch. Otero told Garcia that he needed help. As Garcia was on the way to help Otero, Garcia's gun fired. Otero screamed that he had been hit, told Garcia to "get back," and fired multiple shots at Domann. Garcia testified that Otero fired the shots "during the process of . . . trying to forcibly subdue [the victim] so [they] could commit [the] robbery and burglary."

At that point, Garcia dropped his gun and started running out of the house. Once he realized that Otero was calling for his help and limping, Garcia returned and helped

7

Otero into the wooded area behind the house. Garcia left Otero in the woods and went to the road to flag down Hendricks. Garcia got into Hendricks's truck. Then the men saw Otero and stopped to pick him up in the parking lot behind Domann's house. Hendricks drove the two men to Otero's house and told them they needed to get out of town.

Hendricks's cell phone records corroborated Garcia's testimony. The analysis showed that, at approximately 10:30 p.m. on October 29, 2017, Hendricks's cell phone was located in Kansas City, Kansas. Between 12:10 a.m. and 2:23 a.m. on October 30, 2017, Hendricks's cell phone communicated with cell phone towers near 7th Street Casino in Kansas City, Kansas. Hendricks's cell phone had no communication with cell phone towers until 5:54 a.m., when it communicated with a cell phone tower a little southeast of Domann's home. Then between 6:02 a.m. and 6:07 a.m., Hendricks's cell phone communicated with a different tower, indicating that the phone was traveling west. Between 6:09 a.m. and 8:59 a.m., Hendricks's phone communicated with a series of cell phone towers indicating that the phone traveled from Independence, Missouri to Kansas City, Kansas.

Hendricks testified at trial and denied any involvement in the burglary, robbery, or murder of Domann. Hendricks offered a very different account of the events on October 29 and 30, 2017. Hendricks testified that he had bought a Corvette in Columbia with a bad check. The car dealership demanded that Hendricks either pay for the vehicle or return the vehicle by October 30, 2017. Hendricks said that the text message he sent Casey on October 29, 2017, that said he was "tak[ing] care of it tonight" referred to going to Columbia to talk to the car dealership.

8

Hendricks testified that he met Garcia and Otero later on October 29, 2017, in Independence to arrange the sale of tools and a trailer to a potential buyer in Kansas City, Kansas. Hendricks drove the two men, the trailer, and the tools to Kansas City, Kansas around 7:00 p.m. in his truck. Once the three men arrived to their destination in Kansas City, Kansas, other people arrived and spoke with Garcia, but the sale never occurred.

Between 10:00 p.m. and 11:00 p.m. Hendricks told the men that he was going to go to 7th Street Casino and that they should call him once they had the money for the tools and trailer. Hendricks testified that he did not have a gun and he did not threaten Garcia or Otero. After spending approximately three hours at the casino, Hendricks received a phone call from Garcia, who said that the sale would be complete by the time Hendricks returned. However, the sale was not complete by the time Hendricks returned. Between 1:00 a.m. and 2:00 a.m. on October 30, 2017, Garcia said that they would need to go to the buyer's home and that he and Otero would need a ride back to Independence to get their vehicle.

Hendricks testified that the three men drove around Kansas City, Kansas to two or three locations, following Garcia's and Otero's directions. Hendricks then drove past casinos that Domann and Casey frequented and drove by Casey's and Domann's homes, looking for the Corvette. During the drive, Hendricks told Garcia and Otero that Casey was dating Domann and that he was looking for a Corvette. Hendricks denied ever making a deal with Garcia and Otero to make up the debt they owed him by breaking into a house; denied knowing that either man had a gun; and denied seeing Otero or Garcia with duct tape or zip ties.

9

Hendricks testified that he then drove Garcia and Otero to their vehicle, but it would not run. Hendricks testified that Garcia and Otero said that they needed coolant and parts, so Hendricks dropped the men off at a nearby Walmart, which was within walking distance to Domann's home. Hendricks again told the men to call him whenever they had the money for the trailer and tools. Hendricks drove to a nearby gas station to look for a phone charger and to buy cigarettes and a snack.

Hendricks testified that he then drove by Domann's house again, where he saw Garcia waving his arms and carrying a blue bag. Hendricks stopped to let Garcia in the truck. According to Hendricks's testimony, Garcia yelled that Otero had been shot, that someone was dead, and that he needed to get out of there. Hendricks testified that he looked over and saw Otero in the parking lot, waving. Hendricks drove to the parking lot to pick up Otero. Otero screamed that he had been shot and asked if Garcia "g[o]t the gun." Garcia then pulled a gun out of the bag he was carrying. Hendricks testified that Otero did not want to go to the hospital and instead wanted to go home. Hendricks drove the men back to Kansas City, Kansas, and dropped them off.

Hendricks testified that he then went to his mechanic's house and used chemicals to wash Otero's blood off the floorboard of his truck. Hendricks testified that he panicked after a lawyer told him that there was a warrant out for his arrest, and he "drove off" with Casey, first stopping at his brother's home in Columbia to borrow a pair of glasses, gas money, and his brother's identification. Hendricks admitted that, when he was arrested in Mississippi, he gave police his brother's name and identification.

10

The jury rejected Hendricks's version of the events and found him guilty as charged on all five counts. The trial court sentenced Hendricks as a prior and persistent offender to twenty years' imprisonment for felony murder in the second degree; twenty years' imprisonment for the related armed criminal action charge; ten years' imprisonment for burglary in the first degree; ten years' imprisonment for attempted robbery in the first degree; and ten years' imprisonment for the related armed criminal action charge. The trial court ordered the sentences to run concurrently.

Hendricks appeals.

## Analysis

Hendricks does not challenge his conviction of burglary in the first degree. He does challenge his convictions of attempted robbery in the first degree, felony murder in the second degree, and both related charges of armed criminal action. In his first two points on appeal, Hendricks asserts that the trial court committed instructional error and failed to dismiss the information in lieu of indictment with respect to the charge of attempted robbery in the first degree. In his third point on appeal, Hendricks asserts that there was insufficient evidence to convict him of felony murder in the second degree. In all three points on appeal, Hendricks asserts that reversal of his convictions of either attempted robbery in the first degree or felony murder in the second degree will require reversal of the associated conviction of armed criminal action.

### *Point One: The Verdict Director for Attempted Robbery in the First Degree*

Hendricks's first point on appeal argues that the trial court plainly erred in submitting Instruction No. 13, the verdict director for Count IV, attempted robbery in the

11

first degree.  Hendricks alleges that the instruction did not require the jury to find that a perpetrator was armed with a deadly weapon, a required essential element of the crime.

"To preserve a claim of instructional error, a defendant must make a specific objection to the instruction and the grounds of the objection; the same objection must be renewed in the motion for a new trial."  *State v. Welch*, 600 S.W.3d 796, 806 (Mo. App. E.D. 2020).  Hendricks acknowledges that he did not object to Instruction No. 13 at the instruction conference and did not raise the issue in his motion for new trial.  Hendricks asks us to review the submission of Instruction No. 13 for plain error pursuant to Rule 30.20.

Rule 30.20 allows for review of "plain errors affecting substantial rights . . . in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."  Plain error review requires a two-step process: "first, we must determine whether the trial court committed evident, obvious, and clear error affecting the defendant's substantial rights; second, if plain error is found, we then consider whether the error actually resulted in manifest injustice or a miscarriage of justice.  *State v. Weyant*, 598 S.W.3d 675, 678 (Mo. App. W.D. 2020) (quoting *State v. Berry*, 506 S.W.3d 357, 362 (Mo. App. W.D. 2016)).  "For instructional error to rise to the level of plain error, [Hendricks] must demonstrate that the trial court so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice."  *State v. Hudson*, 574 S.W.3d 796, 804 (Mo. App. W.D. 2019) (quoting *State v. Cooper*, 215 S.W.3d 123, 125 (Mo. banc 2007)).

12

"Instructional error seldom rises to the level of plain error." *Weyant*, 598 S.W.3d at 678 (quoting *Berry*, 506 S.W.3d at 362). Verdict-directing instructions must "require the jury to find every fact essential to conviction," that is, "'every fact necessary to constitute essential elements of [the] offense charged.'" *Hudson*, 574 S.W.3d at 804 (quoting *Cooper*, 215 S.W.3d at 125). A verdict-directing instruction that does not include every element of the crime is a due process violation, given that such an instruction would "relieve[] the State of its burden of proving each and every element of the crime and allow[] the State to obtain a conviction without the jury deliberating on and determining [every] contested element[] of that crime." *Id.* (quoting *Cooper*, 215 S.W.3d at 126). As such, "[p]lain error exists when an instruction omits an essential element and the evidence establishing the omitted element was seriously disputed.'" *Id.* (quoting *State v. Zetina-Torres*, 482 S.W.3d 801, 811 (Mo. banc 2016)).

Count IV of the information charged Hendricks with attempted robbery in the first degree in violation of section 570.023[5] on a theory of accomplice liability. The essential elements of robbery in the first degree are described in section 570.023.1, which provides:

> A person commits the offense of robbery in the first degree if he or she forcibly steals property and in the course thereof he or she, or another participant in the offense:
>
> (1) Causes serious physical injury to any person; or
>
> (2) Is armed with a deadly weapon; or

---

[5]All statutory references are to RSMo 2016 as supplemented through October 30, 2017, the date the crimes were committed.

(3) Uses or threatens the immediate use of a dangerous instrument against any person; or

(4) Displays or threatens the use of what appears to be a deadly weapon or dangerous instrument; or

(5) Steals any controlled substance from a pharmacy.

A person attempts to commit a crime, such as robbery in the first degree, if he or she "performs any act which is a substantial step towards the commission of the offense" with the purpose of committing the offense. Section 562.012.1. Accomplice liability makes "[a] person . . . criminally responsible for the conduct of another when . . . [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he or she aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2).

Instruction No. 13 directed a verdict for attempted robbery in the first degree premised on accomplice liability as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with the other persons with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages other persons in committing it.
>
> As to Count IV, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about October 30, 2017, in the State of Missouri, Xavier Otero and Onelio Garcia armed with deadly weapons used physical force on William Domann, and
>
> Second, that such conduct was a substantial step toward the commission of the offense of robbery in the first degree, and
>
> Third, Xavier Otero and Onelio Garcia engaged in such conduct for the purpose of committing such robbery in the first degree,

14

then you are instructed that the offense of attempted robbery in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of attempted robbery in the first degree, the defendant encouraged or aided Xavier Otero and Onelio Garcia in committing the offense,

then you will find the defendant guilty under Count IV of attempted robbery in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

***A person commits the offense of robbery in the first degree when he or she forcibly steals property.***

As used in this instruction, the term "substantial step" means conduct that is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

(Emphasis added.)

Instruction No. 13 was submitted by the State and was patterned after MAI-CR 4th 424.00 (the pattern instruction for robbery in the first degree). The instruction was modified by MAI-CR 4th 404.06 (the pattern instruction for attempts), by MAI-CR 4th 433.00 (the pattern instruction used to define terms), and by MAI-CR 4th 404.04 (the pattern instruction for accomplice liability). Hendricks's claim of error on appeal relates to the emphasized portion of the instruction, above, and thus to the manner in which MAI-CR 4th 424.00 was modified by MAI-CR 4th 404.06, the pattern instruction for attempts.

MAI-CR 404.06 requires a verdict-directing instruction for attempt to include the following language: "A person commits the offense of [*name of offense*] when he [*Insert*

15

*definition of offense including all elements. Do not use the attempt language in the statute. See Notes on Use 4.*]" Hendricks claims, and the State concedes, that this definition of robbery in the first degree is incomplete, as it did not refer to use of a deadly weapon, an essential element of the crime. Hendricks thus argues that because of the incomplete definition of robbery in the first degree set forth at the end of Instruction No. 13, "the jury could convict Mr. Hendricks even if it believed testimony that he did not know Mr. Otero and Mr. Garcia had guns." [Appellant's Brief, p. 42]

We agree that the definition of robbery in the first degree set forth near the end of Instruction No. 13 is incomplete. However, notwithstanding this error, Instruction No. 13 otherwise required the jury to find each of the essential elements of attempted robbery in the first degree. Instruction No. 13 required the jury to find in paragraphs First, Second, and Third, beyond a reasonable doubt: (1) that Otero and Garcia, armed with deadly weapons, used physical force on Domann; (2) that this conduct was a substantial step toward the commission of robbery in the first degree; and (3) that Otero and Garcia engaged in this conduct for the purpose of committing robbery in the first degree. Instruction No. 13 then directed the jury to find in paragraph Fourth, beyond a reasonable doubt, that Hendricks, "with the purpose of promoting or furthering the commission of attempted robbery in the first degree, . . . encouraged or aided Xavier Otero and Onelio Garcia in committing the offense." While the definition of robbery in the first degree toward the end of Instruction No. 13 was incomplete, that error was harmless because the instruction otherwise required the jury to find from the evidence that every essential element of attempted robbery in the first degree had been proven beyond a reasonable

16

doubt. Because Instruction No. 13 included every essential element of attempted robbery in the first degree, the State retained the burden to prove every element of the offense, and the jury could not have found Hendricks guilty unless it found the State met that burden.[6] Accordingly, the trial court did not plainly err in giving the jury Instruction No. 13.

Our caselaw supports this conclusion. In *State v. Guyton*, 158 S.W.3d 252, 254 (Mo. App. E.D. 2005), the trial court submitted a verdict-directing instruction for attempt to escape from custody that failed to include a definition of escape from custody, as was required by MAI-CR 3d 304.06. The defendant failed to object to the instruction at trial and asked for plain error review on appeal, arguing that the verdict-directing instruction for escape from custody "allowed the jury to convict him on fewer than the essential elements because it failed to include the requisite mental state." *Id.* The Eastern District examined the instruction at issue and observed that, while the "instruction did not require a finding that [the defendant] acted knowingly, the jury was instructed that it had to find he acted purposely." *Id.* at 255. The court concluded that requiring the jury to find the defendant acted purposely was sufficient to establish that the defendant acted knowingly

<hr />

[6]We further note that Instruction No. 15, the verdict-directing instruction for Count V, the associated count of armed criminal action, directed the jury to find Hendricks guilty of armed criminal action if it found that Otero and Garcia committed attempted robbery in the first degree "with the knowing use of a deadly weapon" and that Hendricks, "with the purpose of promoting or furthering the commission of armed criminal action, . . . encouraged or aided Xavier Otero and Onelio Garcia in committing the offense." The explicit inclusion of committing robbery with the knowing use of a deadly weapon in Instruction No. 15 necessarily required the jury to believe that Hendricks knew that Otero and Garcia intended to commit the robbery using guns. As such, the incomplete definition of attempted robbery in the first degree at the end of Instruction No. 13 was cured by Instruction No. 15 so that the error was not prejudicial. *See State v. Cooper*, 712 S.W.2d 27, 30 (Mo. App. E.D. 1986) (finding no prejudice when, in a prosecution for escape from confinement using a dangerous weapon, the verdict-directing instruction omitted the element of using a dangerous instrument because the error was cured by the armed criminal action verdict-directing instruction, which directed the jury to find that the escape was committed by using a dangerous instrument).

because "[w]hen acting knowingly suffices to establish a culpable mental state, it is also established if a person acts purposely." *Id.* (quoting section 562.021.4, RSMo 2000). Thus, the trial court's "failure to define the object crime was harmless because the instruction otherwise contained all the essential elements, including that [the defendant] acted with the requisite mental state." *Id.* The Eastern District found no plain error. *Id.* at 256; *see also State v. Bozarth*, 51 S.W.3d 179, 182 (Mo. App. W.D. 2001) (concluding that a jury instruction that omitted the definition of knowingly but instead directed the jury to find the defendant guilty if he attempted to escape from confinement "for the purpose of escaping" did not result in a manifest injustice or a miscarriage of justice because acting knowingly is established if a person acts purposely).[7]

Point One is denied.

### Point Two: Sufficiency of the Information to Charge Attempted Robbery in the First Degree

Hendricks's second point on appeal concerns Count IV of the information, which charged Hendricks as follows:

> [T]he defendant, in violation of Section 570.023, RSMo, committed the class B felony of attempted robbery in the first degree, punishable upon conviction under Section 558.011, RSMo, in that on or about October 30, 2017, in the County of Jackson, State of Missouri, the defendant either acting alone or purposefully in concert with others armed with a deadly weapons [sic], duct tape and zip ties used physical force on William

---

[7]The authority cited by Hendricks does not alter our conclusion. *State v. Brokus*, 858 S.W.2d 298, 302 (Mo. App. E.D. 1993), concerned a verdict-directing instruction for attempted felonious restraint that omitted "serious" before "physical injury." The Eastern District concluded that the instruction "change[d] the magnitude of the threatened injury that must be proven" so that the trial court committed plain error. *Id.* Hendricks also cites *State v. Carpenter*, 57 S.W.3d 405, 410 (Mo. App. S.D. 2001), where a verdict-directing instruction for burglary in the first degree incorrectly defined the intended crime of assault and allowed the jury to find defendant committed assault purposely or knowingly, thereby relieving the State of the burden to prove the higher mental element of purposely. As discussed *supra*, Instruction No. 13 required the jury to find every element of attempted robbery in the first degree.

> Domann, and in the course thereof Onelio Garcia and Xavier Otero were armed with a deadly weapons [sic].

(Emphasis omitted.) Hendricks claims that the trial court erred in failing to dismiss Count IV of the information because it was insufficient to charge him with attempted robbery in the first degree as it provided inadequate notice of the crime charged. Specifically, Hendricks claims that Count IV of the information "failed to allege any criminal intent or any purpose or intent to cause harm, steal, rob, or commit any crime." [Appellant's Brief, p. 51]

Hendricks's claim of error was not raised at trial, nor included in Hendricks's motion for new trial. However, Rule 29.11(d)(2) provides that a claim of error challenging whether an information states an offense need not be included in a motion for new trial to preserve the claim for appellate review. "[A] defendant may for the first time on appeal raise . . . a . . . claim that the indictment or information was insufficient to charge the crime of which the defendant was convicted." *State v. Parkhurst*, 845 S.W.2d 31, 35 (Mo. banc 1992). As such, Hendricks's point on appeal is preserved for our review.

A charging document will only be deemed insufficient if it was "so defective that (1) it does not by any reasonable construction charge the offense of which the defendant was convicted or (2) the substantial rights of the defendant to prepare a defense and plead former jeopardy in the event of acquittal are prejudiced." *State v. Beck*, 557 S.W.3d 408, 420 (Mo. App. W.D. 2018) (quoting *Parkhurst*, 845 S.W.2d at 35). If the charging document is insufficient under either basis, the defendant must then "demonstrate actual

prejudice, which is that 'the information or indictment was either so deficient that the defendant was not placed on notice as to what crime he or she was being charged with or was so lacking in clarity that the defendant was unable properly to prepare a defense.'" *Id.* (quoting *State v. Williams*, 126 S.W.3d 377, 381 (Mo. banc 2004)). Whether a charging document is sufficient to state an offense is a question of law, which we review *de novo*. *State v. Baker*, 548 S.W.3d 444, 448 (Mo. App. W.D. 2018).

As discussed *supra*, attempted robbery in the first degree requires proof that the defendant performed an act that constituted a substantial step toward forcibly stealing property and, in the course thereof, the defendant or another participant was armed with a deadly weapon. *See* section 562.012.1; section 570.023.1. Stealing, as defined by section 570.030.1(1), occurs if a person "[a]ppropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Thus, an essential element of attempted robbery in the first degree is that the defendant intended to permanently deprive the victim of property. *State v. Walther*, 581 S.W.3d 702, 710 (Mo. App. E.D. 2019).

The State concedes on appeal that Count IV of the information failed to expressly allege that Hendricks or one of his co-defendants, Otero or Garcia, stole or attempted to steal property from Domann. Because the information failed to expressly allege that Hendricks or one of his co-defendants stole or attempted to steal property from Domann, it is axiomatic that the information also failed to expressly allege that either Hendricks or his co-defendants had the purpose to deprive Domann of property permanently. However, this omission does not render the information insufficient.

20

"The purpose of an information is 'to inform the accused of charges against him so that he may prepare an adequate defense and to prevent retrial on the same charges in case of an acquittal.'" *State v. Allen*, 905 S.W.2d 874, 879 (Mo. banc 1995) (quoting *State v. O'Connell*, 726 S.W.2d 742, 746 (Mo. banc 1987)). A charging instrument will ordinarily meet this standard if it cites the statutory section outlining the crime for which the defendant is charged. *Id.* "[W]here the information expressly refers to a statutory section that contains the elements of the crime, the information is not fatally insufficient even if the information itself does not repeat all of the elements of the offense." *Id.*

Here, the information expressly charged Hendricks with violating section 570.023, the statute which describes the essential elements of robbery in the first degree. The information also identified the date of, place of, and acts constituting the offense, thereby placing Hendricks on notice of the offense charged so that he had the opportunity to prepare a defense and preventing retrial on the same charge in the case of acquittal. *See Parkhurst*, 845 S.W.2d at 35 (concluding that because the information cited the statute, which included the level of culpability required for the defendant to be convicted, the omission of the word "knowingly" did not impact the preparation of the defense and would not prevent the defendant from asserting double jeopardy, had he been acquitted). The trial court did not err in failing to dismiss Count IV of the information as insufficient.

Point Two is denied.

21

*Point Three: Sufficiency of the Evidence to Prove Felony Murder in the Second Degree*

Hendricks's final point on appeal asserts that the trial court committed error in denying his motion for judgment of acquittal on Count I, felony murder in the second degree, in entering judgment on the verdict convicting Hendricks of felony murder in the second degree, and in sentencing Hendricks for that crime. Hendricks claims that there was insufficient evidence to establish beyond a reasonable doubt that he committed felony murder in the second degree because the State failed to establish that the homicide occurred during and as a result of the underlying felony of burglary in the first degree.

The State charged burglary in the first degree based on Garcia and Otero "*knowingly enter[ing] unlawfully*" an inhabitable structure. Hendricks does not challenge the sufficiency of the evidence to support a conviction of burglary in the first degree as charged. However, Hendricks claims that the charged crime of burglary had been fully committed once Otero and Garcia unlawfully entered Domann's home with the intent to steal money and Xanax. Since Domann was not killed until *after* the essential elements of burglary in the first degree as charged had been committed, Hendricks argues that Domann's death could not have occurred during or as a result of the crime, as required to support a conviction of felony murder in the second degree.[8]

"Our 'review of sufficiency of the evidence is limited to whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt.'" *State v. Campbell*, 600 S.W.3d 780,

---

[8]Hendricks acknowledges that had the State charged Hendricks with felony murder in the second degree based on knowingly *remaining* in an inhabitable structure, there is authority that would support the conclusion that the evidence was sufficient to convict him of felony murder in the second degree.

786 (Mo. App. W.D. 2020) (quoting *State v. Ajak*, 543 S.W.3d 43, 46 (Mo. banc 2018)). In determining whether the evidence was sufficient to support the conviction and withstand a motion for judgment of acquittal, we do not weigh the evidence; instead we view the evidence and inferences drawn therefrom in the light most favorable to the verdict, disregarding all contrary evidence and inferences. *Id.* We will not, however, "supply missing evidence or grant the State unreasonable, speculative, or forced inferences." *Ajak*, 543 S.W.3d at 46 (quoting *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016)).

Felony murder in the second degree is described in section 565.021.1(2), which provides:

> A person commits the offense of murder in the second degree if he or she: . . . [c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

Felony murder in the second degree requires proof of the commission or attempted commission of any felony, and the death of any person as a result of the perpetration or attempted perpetration of such felony, or as a result of the immediate flight from the perpetration or attempted perpetration of such felony. Section 565.021.1(2); *see also State v. Oates*, 540 S.W.3d 858, 861 (Mo. banc 2018). The central question in a prosecution for felony murder in the second degree is whether a "person died as a result of the defendant's commission of the underlying felony, without regard to the defendant's role in the fatal act." *Oates*, 540 S.W.3d at 861.

23

The information charged Hendricks with felony murder in the second degree because "William Domann was killed by being shot as a result of the attempted perpetration of the class B felony of burglary in the first degree under Section 569.160, RSMo committed by [Hendricks] either acting alone or purposefully in concert with others . . . ." The information charged Hendricks with burglary in the first degree because "[Hendricks] either acting alone or purposefully in concert with others, knowingly entered unlawfully in an inhabitable structure, located at 12501 E 43rd ST South, Independence, Missouri and possessed by William Domann, for the purpose of committing stealing therein, and while in such an inhabitable structure there was present in such inhabitable structure William Doman[n], a person who was not a participant in the crime." Hendricks argues the crime of burglary as charged was completed as soon as Otero and Garcia crossed over the Domann's home's threshold, and that there was no evidence to support a conclusion that Domann 's death occurred during and as a result of the burglary.

We rejected a similar argument in *State v. Manuel*, 443 S.W.3d 669 (Mo. App. W.D. 2014). There, the defendant and an accomplice met with the driver and passenger of a car in an attempt to sell them crack cocaine. *Id.* at 671. The driver and passenger decided not to purchase the drugs, and as the driver started to drive away, he heard at least five gunshots. *Id.* The driver looked over to the passenger and saw that she had been shot. *Id.* The passenger succumbed to her injuries. *Id.* at 671-72. The defendant was convicted of felony murder in the second degree based on the underlying felony of attempted sale of a controlled substance and armed criminal action. *Id.* at 672.

24

On appeal, the defendant argued that "there was insufficient evidence to convict him of felony murder because the jury could not have concluded beyond a reasonable doubt that [the victim] was shot 'in the perpetration of' or 'in the flight from the perpetration of' the underlying felony of attempted sale of a controlled substance." *Id.* We summarized the defendant's argument as follows:

> It is not in contest that [section 565.021.1(2)] [includes] the essential elements of the commission or attempted commission of a felony, and a death. . . . [The defendant] argues that . . . the statute creates two [other] discrete essential elements of felony murder: a temporal element (that a killing occurs *while* and thus *during* the time the essential elements of a felony or its attempt are being perpetrated, or *while* or *during* the immediate flight therefrom), and a causation element (that a killing occurs *as a result* of the felony, its attempt, or the immediate flight therefrom).

*Id.* at 673.

We rejected the defendant's proposed interpretation of section 565.021.1(2), concluding that "the legislature intended the phrase 'in the perpetration or the attempted perpetration' to broadly encompass a continuum from the point where the commission of a felony begins through the point where all other acts or consequences reasonably associated with the felony have occurred including, but not limited to, flight." *Id.* at 674. Thus, the State only has the burden to prove beyond a reasonable doubt "that each of the essential elements of the underlying felony were committed, and not that a death occurred *while* those elements were being committed." *Id.* As such, the evidence will be sufficient to support a conviction for felony murder in the second degree if there is evidence both that (1) the defendant committed the underlying felony offense; and (2) another person died as a result of the perpetration of or flight from perpetration of the

25

underlying felony offense. *Id.* at 675. We concluded that the evidence permitted the conclusion that the victim died as a result of the perpetration of, or flight from the perpetration, of the attempted sale of crack cocaine, given that the passenger was shot as the driver sped away from the attempted drug buy. *Id.* at 677. "The attempt to sell the crack cocaine and [the victim's] death 'were parts of one continuous transaction, and were closely connected . . . in time, place and causal relation.'" *Id.* (quoting *State v. Baker*, 607 S.W.2d 153, 157 (Mo. banc 1980)).

The *Manuel* decision demands the same conclusion here. Hendricks concedes that the evidence was sufficient for the jury to have concluded that Hendricks, either acting alone or purposely in concert with others, knowingly entered Domann's home for the purpose of committing stealing therein. Thus, the only question that remains is whether there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Domann's death was a result of the perpetration of, or flight from the perpetration of, the burglary. The evidence permitted this conclusion beyond a reasonable doubt. Otero shot Domann after he and Garcia, pursuant to the plan the two men had conceived with Hendricks, forced their way into Domann's home with the intent to steal Xanax and a large quantity of cash. The burglary and Domann's death "were parts of one continuous transaction, and were closely connected . . . in time, place and causal relation." *Manuel*, 443 S.W.3d at 677 (quoting *Baker*, 607 S.W.2d at 157).

Point Three is denied.

## Conclusion

The trial court's judgment of conviction and sentence is affirmed.


_Cynthia L. Martin_____
Cynthia L. Martin, Judge

All concur